563 So.2d 937 (1990)
Donna KOSLOWSKI and Wally Koslowski
v.
Dr. Gayle M. SANCHEZ, D.D.S., Shenandoah Dental Clinic, Inc., and CNA Insurance Company.
No. CA 89 0582.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
*938 Ralph L. Fletcher, Baton Rouge, for plaintiff-appellee Donna Koslowski, et al.
Stephen R. Wilson, Baton Rouge, for defendant-appellant Dr. Gayle Sanchez, D.D.S., Shenandoah Dental Clinic, Inc., and CNA Ins. Co.
S. Alfred Adams, William Carruth, Baton Rouge, for Com'r of Ins.
Before LOTTINGER, CRAIN and LEBLANC, JJ.
LOTTINGER, Judge.
This is an appeal by the State of Louisiana's Commissioner of Insurance and the Louisiana Patient's Compensation Fund (collectively referred to hereafter as the "Fund"), from an excess judgment in favor of Ms. Donna Koslowski pursuant to her malpractice action against a qualified dental health care provider and his insurer. Ms. Koslowski alleges that the dental health care provider's use of a filler called N-2 in her root canal has damaged her mandibular nerve and caused permanent *939 partial parathesia (numbness) of her lower left lip and face. Ms. Koslowski alleges that N-2 is inappropriate as a root canal filler because it contains 6.5 percent paraformaldehyde, and that therefore it constituted malpractice to have used it.
The jury in the trial below rendered a verdict of $250,000.00 in general damages against Dr. Gayle Sanchez, D.D.S., and his insurer in favor of Ms. Koslowski. The jury found in favor of Dr. Sanchez and his insurer on Mr. Koslowski's loss of consortium claim, and he has not appealed.
Dr. Sanchez's insurer, Continental Casualty Company, paid its policy limits of $100,000.00, was released by plaintiffs, and has not appealed. The Fund intervened and has suspensively appealed the award in excess of $100,000.00, contesting liability, damages, and whether certain of the plaintiff's expert witnesses should have been allowed to testify.
Ms. Koslowski contends in her reply brief that since the insurer "settled" for its statutory limit of $100,000.00, that the Fund cannot appeal the liability issue, but can only appeal the amount of the award.

FACTS
On September 6, 1984, Ms. Donna Koslowski went to the office of Dr. Gayle Sanchez, D.D.S., a general dentist practicing in Baton Rouge, Louisiana, with complaints of pain in her lower left molar area. This was the first time that Ms. Koslowski had been to see Dr. Sanchez. After examining Ms. Koslowski and taking X-rays, Dr. Sanchez performed a root canal on her lower left second molar.
This was not Ms. Koslowski's first root canal. She had several root canals done on various other teeth in the past. Basically, a root canal is the removal of the diseased or infected pulp and root of a tooth, after which the empty area, or canal, is filled in with some type of filler material. There are dozens of different filler materials available.
Dr. Sanchez used a filler called N-2, or Sargenti paste, to fill Ms. Koslowski's root canal. This paste was being used by about half of the dentists practicing in Baton Rouge at that time. N-2 is 6.5 percent paraformaldehyde and is designed to disinfect and render harmless any pulp left inside the canal, while at the same time acting as a filler. This allows a root canal to be done in one visit and makes it less imperative to remove all of the pulp material.
Most endodontists (dentists who limit their practice to root canals), use an inert filler material called gutta-percha. It is more important to remove all of the pulp material when using this filler so that infection does not occur. If infection is already present, the canal is usually first packed with an antiseptic material to get rid of the infection. Later, the antiseptic material is removed and replaced with the gutta-percha.
The antiseptic material used by most endodontists and dentists, is called formacreasol and contains 19 percent formaldehyde and 35 percent creasol. This material is widely used and accepted in the endodontic and dental communities even though it contains a higher level of formaldehyde than N-2.
Dr. Sanchez testified that he also uses formacreasol to disinfect a canal if an infection is present, but that he prefers to use N-2 instead of gutta-percha as a filler because it provides a better seal. In Ms. Koslowski's case, there was no infection present after the pulp was removed, so Dr. Sanchez filled the canal with the N-2 paste from the beginning and did not use formacreasol.
The tooth that Dr. Sanchez did a root canal on for Ms. Koslowski had what is called a blunderbuss canal. This is a single large canal that doesn't taper to a point at the end. This canal extended down and ended either in, or very near, Ms. Koslowski's mandibular canal. The mandibular canal is the canal in the jawbone that contains the nerves which innervate the lips and lower facial area.
When Dr. Sanchez filled Ms. Koslowski's canal, some of the N-2 paste, which goes in as a semi-liquid then later hardens, leaked out of the bottom of the root canal into the *940 mandibular canal. When filler material leaks out of the bottom of a root canal, it is said that an overfill has occurred. Overfills are not uncommon and there was uncontradicted expert testimony that an overfill is not in itself considered to be malpractice, and that an overfill is more likely when a blunderbuss canal is being filled.
After completing Ms. Koslowski's root canal, Dr. Sanchez again took X-rays. This set of X-rays showed that an overfill had occurred. Dr. Sanchez informed Ms. Koslowski of the overfill and told her it might cause problems. He prescribed antibiotics and pain killers and told her to call if she had any trouble with the tooth.
After unsuccessfully trying to see Dr. Sanchez on September 11, 1984, Ms. Koslowski returned to Dr. Sanchez's office on Friday, September 14, 1984. She was complaining of pain in the tooth and numbness of the lower left face and lip.
After examining and consulting with Ms. Koslowski, Dr. Sanchez extracted the tooth, took another set of X-rays, and tried to remove the overfill of N-2 from Ms. Koslowski's mandibular canal. His efforts to remove the overfill were unsuccessful, and Dr. Sanchez suggested at that point that Ms. Koslowski see an oral surgeon.
The feeling never returned to Ms. Koslowski's lower face and lip, nevertheless, Ms. Koslowski did not see the oral surgeon she was referred to nor did she return to see Dr. Sanchez. Approximately one year later Ms. Koslowski retained an attorney who filed this dental malpractice suit against Dr. Sanchez following review by a medical review panel pursuant to La.R.S. 40:1299.41, et seq.
On the advise of her attorney, Ms. Koslowski saw Dr. William Chisholm, Jr., D.M.D., a Baton Rouge endodontist in September of 1985; and Dr. Paul Rosenberg D.D.S., a New York endodontist, in January of 1986. Both Drs. Chisholm and Rosenberg concluded that Ms. Koslowski suffers from permanent partial paresthesia of the lower left lip and facial area. In their opinion, this condition more likely than not resulted from the overfill of N-2 paste damaging the mandibular or inferior alveolar nerve.
The medical review panel found that the evidence failed to support the conclusion that Dr. Sanchez did not meet the applicable standard of care as alleged in the complaint. The panel was unable to determine whether Dr. Sanchez's conduct was or was not a factor in causing Ms. Koslowski's paresthesia.
At trial, plaintiff's counsel repeatedly asserted that the only negligence committed by Dr. Sanchez was the selection of N-2 paste as a filler. Plaintiff's theory seemed to be that N-2 should never be used to fill a root canal, and even if it is proper to use it in some cases, it should not have been used on Ms. Koslowski since she had a blunderbuss canal that ended in close proximity to her mandibular canal.
The plaintiffs introduced evidence of the existence of a controversy surrounding the use of N-2 in performing root canals. They cited articles published prior to September of 1984 which criticized the use of N-2 in performing root canals because of the risk of parathesia. All of the defendant's expert witnesses testified that the controversy surrounding N-2 was "created" by endodontists for political and economic reasons. The gist of this theory is that because N-2 allows general practictioner dentists to perform root canals more efficiently and therefore charge less for them, that this hurts endodontists' practices, who normally charge twice as much for a root canal as a general dentist does.
In support of this theory, the defendants' expert general dentists pointed out that almost any material that comes into contact with a nerve such as the mandibular or inferior aveolar nerve can damage it, whether that material is inert or not. They also pointed to formacreasol, an antiseptic widely used to treat infections in root canals, which contains a higher level of formaldehyde than N-2, yet is widely accepted by endodontists and dentists alike. The defendants also alleged that all of the articles criticizing N-2 were written by endodontists.

*941 TRIAL COURT
After a trial on the merits, the jury found that Dr. Sanchez either lacked the degree of knowledge or skill possessed, or failed to exercise the degree of care ordinarily exercised, by dentists licensed to practice in the State of Louisiana and actively practicing in a similar community or locale and under similar circumstances; or failed to use reasonable care and diligence, along with his best judgment in the application of that knowledge or skill.
The jury awarded Ms. Koslowski $250,000.00 in general damages. The trial court denied defendants' motion for new trial or remittitur. The defendant insurer paid its policy limit of $100,000.00 and has not appealed.

ASSIGNMENTS OF ERROR
The Fund thereafter intervened and appealed suspensively assigning three errors. First, that the trier of fact erred in concluding that Dr. Sanchez committed medical malpractice; second, that the trial court erred in allowing endodontists to testify concerning the standard of care in this general dentistry malpractice case; and third, that the trier of fact erred in awarding excessive damages.

APPEAL BY THE FUND
The plaintiff/appellee contends that because the defendant insurer paid its policy limits of $100,000.00, and was released by plaintiffs, that defendant has admitted liability and the Fund can only appeal quantum. We will address this issue first.
The plaintiff relies on La.R.S. 40:1299.44(C)(5) which provides in pertinent part:
"In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars."
Since the plaintiff/appellee is seeking to deny the right of the fund, a budget unit of the State, to appeal its liability to plaintiff/appellee, and is relying on a statute to do so, that statute will be strictly construed.
The plaintiff asserts that a settlement was entered into, and the fact that it occurred subsequent to a final judgment is irrelevant. The plaintiff cites Kelty v. Brumfield, 534 So.2d 1331 (La.App. 4th Cir.1988), writs denied, 536 So.2d 1221, 536 So.2d 1222 (La.1989), for the proposition that once a maximum settlement has been entered into, the Fund cannot thereafter contest liability. In Kelty, the plaintiff settled with the defendant health care providers prior to trial. In the instant case the "settlement" occurred after a final judgment imposing liability on the health care provider and his insurer was rendered.
The instant case is more analogous to Felix v. St. Paul Fire and Marine Insurance Company, 477 So.2d 676, 681 (La. 1985), also cited by plaintiff, than to Kelty. In Felix, the health care provider chose not to appeal a judgment in excess of one hundred thousand dollars, but instead paid the full amount of her liability under the statute. The plaintiff in Felix asserted that the fund had no right to intervene and appeal. The Louisiana Supreme Court in that case held that:
"[A]fter a judgment is rendered in a suit between the claimant and the health care provider awarding damages against the health care provider in excess of one hundred thousand dollars, the commissioner and the fund have an interest in the action for the purpose of appealing the excess judgment against the fund."
Felix, at 681.
Although the issue does not seem to have been raised, the Felix court did not apply La.R.S. 40:1299(C)(5) to preclude an appeal on the issue of liability by the fund, therefore that case is not dispositive of the issue before us.
The plaintiff asserts that neither the statute, nor the Fourth Circuit in Kelty, makes a distinction between a settlement before or after trial. Kelty involved a pre-trial *942 settlement. There was no need in that case to consider the effect of a post-judgment settlement. Therefore, the fact that the Kelty court made no distinction between pre and post trial settlements is of no moment.[1]
The statute, on the other hand, and in particular the provisions therein relied upon by plaintiff, contemplate a pre-trial settlement, in our opinion. Subsection (C)(5) provides that the court, in approving a settlement[2] or determining the amount to be paid by the Fund, i.e. any liability to the plaintiff in excess of one hundred thousand dollars, must consider the liability of the health care provider as admitted "where the insurer has paid its policy limits...." In other words, where the insurer has paid its policy limits, the only issue to be decided at trial is quantum, and the fund is only liable for damages in excess of one hundred thousand dollars. Kelty.
The statute clearly contemplates a situation where the insurer has paid its policy limits prior to a determination of the amount to be paid by the Fund. In the instant case, the amount to be paid by the Fund was determined, by a final judgment, prior to the insurer paying its policy limits.
Therefore La.R.S. 40:1299.44(C)(5) did not mandate that the trial court consider the liability of the health care provider as admitted; and indeed, the trial court properly submitted this question to the jury. Nor does the statute mandate that this court consider the liability of the health care provider as admitted. The amount to be paid by the Fund had already been determined, via a final judgment, prior to the insurer paying its limit of liability. This judgment is now being appealed and it is the function of this court, not to determine the amount to be paid by the Fund, but merely to review the correctness of the decision below.[3] Therefore the fund is free to appeal the issue of the health care provider's liability, since it is not precluded from doing so by the statute.

EXPERT WITNESSES
We will next consider the Fund's second assignment of error in which it contends that the trial court erred in allowing plaintiff's two endodontist expert witnesses to testify concerning the standard of care applicable to a general dentist.
The Louisiana Supreme Court has held that it is the specialist's knowledge of the subject matter which will determine whether he may testify as to the degree of care that should be exercised by general practitioners. McLean v. Hunter, 495 So.2d 1298 (La.1986).
The two expert witnesses of which the Fund complains were both endodontists. An endodontist is a dentist who limits his practice to root canals, the operative procedure out of which this action arose. Both of these witnesses, Dr. Chisholm and Dr. Rosenberg, testified that they had performed hundreds of root canals. Thus, they both had the requisite knowledge to testify concerning the standard of care applicable to performing root canals.
*943 However, since the defendant health care practitioner did not hold himself out to be a specialist, the locality rule applies. La.R.S. 9:2794(A)(1); Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978). Under this rule the applicable standard of care is that which should be exercised by a dentist performing a root canal in a similar community or locale and under similar circumstances. La.R.S. 9:2794(A)(1).
Dr. Chisholm practices in Baton Rouge, the same community as Dr. Sanchez, therefore he was qualified to testify concerning the applicable standard. Dr. Rosenberg, on the other hand, practices in Manhattan. There was no evidence that Manhattan is a community or locale similar to Baton Rouge. Therefore Dr. Rosenberg was not qualified to testify as to the standard of care which should be exercised by a dentist performing a root canal in Baton Rouge. Caldwell v. Parker, 340 So.2d 695 (La.App. 4th Cir.1976), writ denied 342 So.2d 1120 (La.1977).
Dr. Rosenberg testified (via a video deposition being shown to the jury during trial) that a dentist acts below the proper standard of care when he uses N-2 paste. The trial judge erred in allowing this testimony, or at least in not giving an instruction to the jury that this part of his testimony was inadmissible and should be disregarded. This cannot be considered harmless error since Dr. Rosenberg was the only expert to give this testimony. Dr. Chisholm did not testify as to the proper standard which should be exercised by a general dentist in performing a root canal. His testimony was limited to the standard exercised by endodontists.
The Louisiana Supreme Court has recently held that where a jury verdict is "tainted" by erroneous jury instructions or by the erroneous exclusion/admission of testimony, the jury verdict is not entitled to a presumption of regularity, and thus the manifest error rule does not apply. McLean v. Hunter, 495 So.2d 1298 (La.1986).
"When a jury is given incorrect instructions in the law, or when a trial court makes a consequential error in the exclusion of evidence, no weight should be accorded the judgment of the trial court which implements the jury verdict....
"What an appellate court must do at this juncture is make an independent review of the record before it and decide which party should prevail by a preponderance of the evidence. Due consideration and appropriate weight should be given to all of the evidence....
"... The court of appeal shall make an independent determination of whether or not the plaintiff's evidence preponderates, without affording any deference to the jury verdict." (citations and footnote omitted).
McLean, at 1304.
In the case before us, there has been an erroneous admission of expert testimony. Therefore, the jury's verdict has been "tainted," and we will decide this case on the record before us without taking the jury's verdict into consideration.

LIABILITY
In a dental malpractice case, the burden of proof on a plaintiff is to establish a deviation by the dentist from the standard of care required of other dentists actively practicing in a similar community or locale and under similar circumstances. La.R.S. 9:2794. The elements of proof required are set out in La.R.S. 9:2794(A) as follows:
"A. In a malpractice action based on the negligence of ... a dentist ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... dentists ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances;....
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

*944 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."

STANDARD OF CARE
The plaintiff in this case failed to present any admissible evidence concerning the degree of knowledge or skill possessed or the degree of care ordinarily exercised by a general practictioner dentist practicing in Baton Rouge, Louisiana or a similar community and under similar circumstances. That is, plaintiffs failed to present evidence on the standard of care applicable in this case.
The plaintiff's only expert witness qualified to testify on this issue, Dr. Chisholm, testified only as to the standard of care which should be exercised by an endodontist, he did not testify as to the standard of care which should be exercised by general practitioner dentists.
The defendant's expert witness, Dr. Newman,[4] a general practitioner dentist in Baton Rouge, Louisiana, testified that the use of N-2 by a dentist in Baton Rouge was an acceptable practice and within the degree of care ordinarily exercised by area dentists in September of 1984. He further testified that N-2 was routinely being used by approximately 50 percent of Baton Rouge dentists in 1984, and a substantial number still use it. This testimony was unrebutted.
The plaintiff also failed to present evidence that Dr. Sanchez's lack of knowledge of the alleged effects of N-2 was below the applicable standard of care. The plaintiff presented evidence that information concerning the controversy surrounding N-2 was available to the defendant prior to September of 1984, and Dr. Sanchez admitted that he was unaware of this controversy prior to that time. However, the plaintiff did not introduce evidence that Dr. Sanchez or other dentists in similar communities should have known of this controversy in order to meet the applicable standard of care.
Therefore, the plaintiff has failed to establish by a preponderance of the evidence the first element of proof necessary to sustain her malpractice claim against Dr. Sanchez. That is, the plaintiff has not proven by a preponderance of the evidence that the use of N-2 in a root canal is malpractice in and of itself.

LACK OF REQUISITE KNOWLEDGE OR FAILURE TO USE REASONABLE CARE
The fact that Dr. Sanchez was unaware of the controversy concerning the use of N-2 does not satisfy the second element of proof. This is because, as we have previously pointed out, the plaintiffs have failed to establish that it was below the applicable standard of care for Dr. Sanchez not to know about the controversy. Thus the plaintiff did not prove that Dr. Sanchez lacked the requisite degree of knowledge.
As to Dr. Sanchez's skill and use of reasonable care and diligence; all of the experts were in agreement that an overfill is not uncommon, especially in a blunderbuss canal. They all concurred that an overfill does not constitute malpractice; i.e. it is not below the standard of care of either a dentist or an endodontist. The plaintiff did not prove that Dr. Sanchez lacked the requisite skills or that he did not use reasonable care and diligence.
As to whether Dr. Sanchez used his best judgment in the application of that skill when he used the N-2 paste; the plaintiff's experts testified that use of N-2 increases the risks of injury to the patient when there is an overfill, and generally expressed their opinion that N-2 should never be used in a root canal.
*945 The defendant's experts testified that any material, be it gutta-percha, N-2, or even the dentist's instruments, can cause parathesia if it comes into contract with the mandibular nerve. Therefore, anytime there is an overfill that gets into the mandibular canal, parathesia can result. Parathesia can even be caused by the needle used to administer local anaesthetic, if it contacts this nerve, and by extraction of a tooth with roots in close proximity to this nerve. Therefore, an overfill of any material where the root is in close proximity to the mandibular canal can cause parathesia.
Although the shape and size of the root canal is readily discernable from an X-ray, the proximity of the root canal to the mandibular canal is not so easily determined. This is due to the two dimensional nature of an X-ray. Therefore, there was no way that Dr. Sanchez could have known exactly how close the root canal was to the mandibular canal.
Even assuming that Dr. Sanchez knew of the controversy concerning N-2, that he knew of the proximity of the root canal to the mandibular nerve, and that he knew the shape and size of the root canal, we cannot say that his use of N-2 was such bad judgment as to constitute malpractice. This is so because, as pointed out above, anything coming into contact with the mandibular nerve has the potential of causing parathesia. Thus, anything that Dr. Sanchez would have used as a filler could have caused parathesia in Ms. Koslowski's case.
Therefore, the plaintiff has failed to prove the second element necessary to sustain her malpractice claim by a preponderance of the evidence. Given our disposition of these first two elements, we pretermit consideration of the third element.

INFORMED CONSENT
Nor has the plaintiff proven her case by a preponderance of the evidence on an informed consent or failure to warn theory. A physician or dentist is not required to warn a patient of every conceivably possible risk that may stem from a particular procedure; nor is he required to inform the patient of an event that cannot be reasonably anticipated or of a very remote or rare possibility of complications. Wiley v. Karam, 421 So.2d 294 (La.App. 1st Cir.1982); Babin v. St. Paul Fire and Marine Insurance Company, 385 So.2d 849 (La.App. 1st Cir.), writ denied, 386 So.2d 358 (La.1980).
The unrefuted testimony in this case was that out of about seventy-five million root canals performed in the United States during the past ten years using N-2 filler, only ten to fifteen cases of parathesia have been reported. This is not such a high percentage that would impose a duty upon a dentist to warn his patient of possible parathesia. The fact that Dr. Sanchez was unaware of the controversy surrounding N-2 is irrelevant since he had no duty to warn even if he had known about it. Even if a duty did exist, the failure to disclose a possible danger is not a breach of duty on the part of the health care provider in the absence of a showing that the patient's consent would not have been given if he had been warned of the danger. Babin; Wiley. Although the plaintiff testified that she would not have consented had she known of the risk of parathesia, this testimony is self serving and was made with the benefit of hindsight.
Given the very small chance of parathesia, that Ms. Koslowski had several root canals previously, and that the alternative to a root canal was extraction of the tooth; we are of the opinion that a reasonable person in this situation would have consented to the root canal even if warned that there was a one in 5,000,000 chance of parathesia. A reasonable person in Ms. Koslowski's situation would not have withheld consent, but would have wanted to save the tooth if possible.
Therefore, the plaintiff has failed to prove by a preponderance of the evidence that Dr. Sanchez committed dental malpractice in his treatment of her. Since we have found that the plaintiff has not proven liability, we will not address the issue of quantum.
Even had we not decided this case on its merits, we would have been compelled *946 to hold that the jury's verdict was manifestly erroneous. The evidence was undisputed that approximately fifty percent of the dentists in Baton Rouge used this material at the time of plaintiff's visit to Dr. Sanchez and that a substantial percentage continue to use it. It was also undisputed that only ten to fifteen cases of parathesia have been reported out of seventy-five million root canals filled with N-2 in the United States during the last ten years.
There was also uncontradicted testimony that it was not below the applicable standard of care for a dentist in Baton Rouge, Louisiana to use N-2 to fill a root canal in 1984; and that any material coming into contact with the mandibular nerve can cause parathesia. All of the experts testified that when performing a root canal, an overfill is not uncommon and does not constitute malpractice. Finally, it was established that a commonly used and generally accepted antiseptic material, formacreasol, which is used to treat infections in root canals, contains higher levels of the potentially caustic ingredient contained in N-2, which was the basis for plaintiff's entire complaint.
Given the foregoing, together with the absence of any evidence that Dr. Sanchez lacked or failed to exercise proper dental skills, it was manifest error for the jury to render a verdict in favor of the plaintiff.
For the foregoing reasons IT IS ORDERED ADJUDGED and DECREED that the judgment of the trial court in favor of plaintiff, Donna Koslowski, and against defendants, Dr. Gayle Sanchez and Continental Casualty Company, is hereby REVERSED and this case is dismissed at plaintiff's costs. Judgment is hereby rendered in favor of Douglas D. Green, in his capacity as Commissioner of Insurance for the State of Louisiana and the Louisiana Patient's Compensation Fund and they are hereby dismissed from this proceeding. All costs are to be assessed to plaintiff.
REVERSED AND RENDERED.
NOTES
[1] Likewise, the recent Louisiana Supreme Court case of Stuka v. Fleming, 561 So.2d 1371 (La. 1990) also involved a pre-trial settlement. Therefore that case is not dispositive of the issue at bar.

The Stuka court held that the Fund cannot contest the health care provider's liability, but is limited pursuant to La.R.S. 40:1299.44(C)(5) to the issue of quantum and nothing more, even where several health care providers are named as defendants, and the plaintiff has only settled with one and voluntarily dismissed the others from his suit. The settlement involved in Stuka occurred prior to trial and the issue of the effect of a post-judgment settlement was never raised nor was that issue decided therein.
[2] The "settlement" contemplated here must be with the Fund; because as the rest of the subsection provides, the insurer must have already paid its policy limits in order for liability to be deemed admitted. The Fund has not agreed to a settlement in the instant case, so the trial court had no settlement to approve.
[3] Even if this Court were to decide the case on its merits, as where the jury has been "tainted" (See, McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986), we would merely be deciding the case based on the evidence which was properly presented at trial, and our decision would therefore be tantamount to a decision rendered after trial on the merits. Any settlement entered into after the case was submitted to the jury below would not be considered.
[4] The defendant's other expert witness, Dr. Alvin H. Artz, a general practitioner dentist from Pennsylvania, while admittedly knowledgeable in his field, is in the same position as Dr. Rosenberg. He has no knowledge of the standard of care exercised by general dentists in Baton Rouge; and there was no proof offered that Levitown, Pennsylvania, where Dr. Artz practices, is a community similar to Baton Rouge, Louisiana. Therefore Dr. Artz was not qualified to testify concerning the standard of care applicable in this case.